UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

NSJ Investors, LLC, Civ. File No. 01-1932 (PAM/SRN)

Plaintiff,

v. **MEMORANDUM AND ORDER**

TH/North San Jose, LLC,
Citicorp North America, Inc.,
Louis S. Caiola, Louis Cortese,
and Tishman/Heskin Partners,

Defendants.

---

This matter is before the Court on a Motion to Dismiss Cross-claims and to Compel Distribution of Funds filed by Defendants TH/North San Jose, LLC ("TH/North") and Tishman/Heskin Partners ("Tishman"), and a Motion for Judgment on the Pleadings filed by Defendants Louis Caiola and Louis Cortese. Caiola and Cortese do not object to the dismissal of their cross-claims, and thus the Motion to Dismiss Cross-claims is granted. For the reasons that follow, however, the Motion to Compel Distribution is denied, and the Motion for Judgment on the Pleadings is granted.

**BACKGROUND**

In October 2001, this Court granted the motion of Plaintiff NSJ Investors, LLC ("NSJ") for an interpleader of certain disputed sums of money. Since that time, more than $1.5 million has been deposited with the Court.

SEP 10 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD SEP 10 2002
DEPUTY CLERK

NSJ is a limited-liability company formed by several investors to purchase, develop, lease, and eventually re-sell commercial property in and near San Jose, California. The investors (also called "Members") in the company include Mr. Caiola and Mr. Cortese, Citicorp North America ("Citicorp"),[1] and the developers of the property, TH/North and Tishman. In the LLC Agreement for NSJ, TH/North was designated as the Managing Member of the company. In 1997, NSJ purchased two pieces of commercial property. One was sold in early 2001 for a substantial profit.[2] The other is subject to a ten-year lease and, because of the downturn in the real estate market in San Jose, likely cannot be sold without incurring a loss.

After the first property was sold in early 2001, a dispute arose between the Members as to how the proceeds from the ten-year lease on the other property should be distributed among the Members. Caiola and Cortese assert that the LLC Agreement mandates that the rent payments be considered Net Cash Flow and should be distributed according to each Member's percentage interest in NSJ. (LLC Agreement § 4.2(a).) TH/North and Tishman contend that the payments are Net Capital Proceeds and should be distributed according to each Member's residual percentage interest in NSJ. (LLC Agreement § 4.2(b).) The difference between each member's percentage interest and residual percentage interest is

---

[1] Citicorp has taken no position in this lawsuit.

[2] The total original investment for the purchase of both properties was just over $6 million. The selling price of the property sold in 2001 was $20.7 million.

significant. The Members' percentage interests are as follows: Citicorp 15%; Caiola 72%; Cortese 3%; Tishman 9%; and TH/North 1%. By contrast, the Members' residual percentage interests are: Citicorp 30.0758%; Caiola 36.3636%; Cortese 1.5152%; Tishman 4.5454%; and TH/North 27.5%. (LLC Agreement Ex. B at 7.)

TH/North and Tishman now seek to dismiss Caiola and Cortese's cross-claims against them and seek to compel the distribution of a portion of the deposited money over which they contend there is no dispute. For instance, according to TH/North and Tishman, the parties agree that under either interpretation of the LLC Agreement the minimum amount Caiola should receive is 36.3636%, and thus the Court should allow NSJ to distribute that percentage of the money to Caiola. TH/North also asks the Court to consider its interest and the interest of Tishman together and contends that the minimum amount these two entities are due is 10%.

As noted above, Caiola and Cortese concede that their cross-claims should be dismissed. They oppose, however, TH/North and Tishman's proposed distribution of a portion of the interpleaded funds. They have moved for judgment on the pleadings, contending that the plain terms of the LLC Agreement mandate that the rent proceeds be considered Net Cash Flow and distributed according to the Members' percentage interest in NSJ.

Because Caiola and Cortese's Motion for Judgment on the Pleadings is dispositive, the Court will address that Motion first.

## DISCUSSION

### A. Standard of Review

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is analyzed according to the same standards as a motion to dismiss under Rule 12(b)(6). Westcott v. Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). The Court must construe the allegations in the pleadings and reasonable inferences arising from the pleadings favorably to the non-moving parties, in this case TH/North and Tishman. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). The Court should not, however, "blindly accept the legal conclusions drawn by the pleader from the facts." Id. A motion for judgment on the pleadings will be granted only if "it appears beyond doubt that the [non-movants] can prove no set of facts which would entitle [them] to relief." Id.; see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

### B. Merits

The resolution of the parties' dispute over the interpleaded funds depends entirely on whether those funds constitute Net Cash Flow or Net Capital Proceeds under the terms of the LLC Agreement. The Court may determine this question as a matter of law if it finds that the LLC Agreement is unambiguous. Realex Chem. Corp. v. S.C. Johnson & Son, Inc., 849 F.2d 299, 302 (8th Cir. 1988).

#### 1. Terms of the LLC Agreement

The LLC Agreement contains a Glossary of Terms which is attached to the Agreement as Exhibit B. This Glossary defines the disputed terms as follows:

> "<u>Net Cash Flow</u>" means all gross cash receipts realized by the Company, after payment of all costs and expenses . . ., in connection with the ownership and operation of the Project . . . exclusive of Net Capital Proceeds . . . .
>
> "<u>Net Capital Proceeds</u>" means the net cash proceeds realized by the Company in connections with a Major Capital Event . . . .
>
> "<u>Major Capital Event</u>" means . . . the sale, exchange, condemnation, casualty loss or other disposition (whether voluntary or involuntary) of all or any part of the Project or any interest therein . . . .

(LLC Agreement Ex. B at 4-5.) Caiola and Cortese contend that rent payments are precisely what the parties contemplated as Net Cash Flow. TH/North and Tishman argue that rent payments are Net Capital Proceeds or, at the least, that the Agreement is ambiguous as to how rent payments should be characterized, making judgment on the pleadings inappropriate. In the alternative, TH/North and Tishman assert that, if Caiola and Cortese are correct as to the proper reading of the LLC Agreement, the Agreement does not comport with the intent of the parties and should be reformed.

According to TH/North and Tishman, the Agreement contemplated a "waterfall" arrangement. Under such an arrangement, the parties are first repaid their capital contributions to the project (the so-called "first waterfall"). Next, the parties are paid some previously agreed percentage return on their investment (the "second waterfall"). Finally, the developer and manager of the project, which coincidentally in this case is TH/North, is paid for what TH/North characterizes as the substantial risk of time and effort spent in initiating the project (the "third waterfall"). TH/North and Tishman argue that such waterfall

arrangements are typical in real estate development agreements and are necessary to ensure that TH/North is fully compensated for the time it put into this endeavor prior to the other Members contributing anything to it. The parties are in agreement that, however such payments are characterized, they have been repaid their initial investments and have received in excess of the agreed-on return for their investments.

The plain terms of the LLC Agreement do not provide for the waterfall arrangement described by TH/North and Tishman. It may be true that the typical real estate investment scheme involves waterfall arrangements, but this particular investment scheme does not. The LLC Agreement provides for the distribution of money in a far simpler manner: if the money is Net Cash Flow, it is distributed one way, and if the money is Net Capital Proceeds, it is distributed another way. Although the LLC Agreement does require that income characterized as Net Capital Proceeds follow the "waterfall" distribution scheme claimed by TH/North and Tishman, the plain terms of the Agreement do not require this type of distribution scheme for all income. Indeed, for income characterized as Net Cash Flow, the LLC Agreement clearly does not provide for the waterfall arrangement that TH/North and Tishman attempt to superimpose on the entire Agreement.

2. <u>Tax burden allocation</u>

TH/North and Tishman next argue that the Agreement is ambiguous because of a purported inconsistency between the distribution scheme for Net Cash Flow and the income allocation for tax purposes. According to TH/North and Tishman, the Agreement requires

TH/North, as Managing Member, to allocate all income after the payment of the first two waterfalls as if that income were Net Capital Proceeds. In other words, TH/North and Tishman contend that, for tax purposes, the rent payments will be allocated according to each Member's residual percentage interest, but that the real distribution urged by Caiola and Cortese will be according to each Member's percentage interest. This discrepancy, according to TH/North and Tishman, renders the Agreement contrary to the Internal Revenue Code and relevant Treasury Department regulations. At the least, they argue, the inconsistency in the Agreement creates ambiguity that cannot be resolved on a motion for judgment on the pleadings.

The tax burden allocation argument TH/North and Tishman raise is a red herring. Section 4.1 of the Agreement provides that, for the purposes of determining each Member's capital account balance, profits be allocated according to that Member's residual percentage interest. The Treasury regulations require that each Member's capital account balance properly reflect cash distribution and profit and loss allocations so that the Members do not receive more than they are due when the company is liquidated. Treas. Reg. § 1.704-1(b)(2)(ii)(b). This outcome is ensured by section 4.4 of the Agreement, which directs the Managing Member "to allocate income, gain, loss or deduction in a manner which is inconsistent with Section 4.1 to the extent necessary to comply with" the Internal Revenue Code and regulations. (LLC Agreement § 4.4(a).) Thus, when NSJ is liquidated, if the Members' capital account balances are inconsistent with the substantial economic effect

requirement in the Treasury regulations, the Managing Member may fix the balances to comply with the regulations.

TH/North and Tishman then assert that any resort to section 4.4's savings provision itself creates an ambiguity or internal inconsistency. The Court does not understand how this is so. The Agreement attempts to cover every forseeable situation, including the instant situation where NSJ is receiving more money as Net Cash Flow than the parties anticipated. Merely because the Agreement provides that the parties may disregard one section when necessary to comply with the law does not mean that the Agreement is ambiguous or internally inconsistent. The income allocation provisions do not create an ambiguity and do not mandate the reading of the Agreement urged by TH/North and Tishman.

3. Reformation

It is a well-settled principle of contract law that reformation may be had only where there is mutual mistake or fraud. Rock-ola Mfg. Corp. v. Filben Mfg. Co., 168 F.2d 919, 923 (8th Cir. 1948). TH/North and Tishman contend that reformation is appropriate because the parties envisioned that NSJ would be in existence for a short time, not foreseeing the collapse of the real estate market and the subsequent need for NSJ to remain in business and oversee a ten-year lease. However, the Court cannot rewrite a contract merely because the parties or their lawyers may not have envisioned a certain result or because the contract does not say what one party hoped it would say. The parties in this case are all sophisticated business entities with substantial experience in the real estate market who negotiated their contract at

arm's length and with the help of very able attorneys. At the most, TH/North and Tishman have alleged that they thought that the Agreement provided for a waterfall arrangement, not that all parties thought that the Agreement provided for a waterfall arrangement. This is not mutual mistake or fraud that would justify reforming the Agreement.

The Court finds that the Agreement is complete and its terms are clear and unambiguous. Thus, the Court may resolve the parties' dispute as a matter of law. Realex Chem. Corp., 849 F.2d at 302.

4. Net Cash Flow vs. Net Capital Proceeds

Under the unambiguous terms of the Agreement, the rent proceeds from the ten-year lease constitute Net Cash Flow. The proceeds from the lease are perhaps the very definition of Net Cash Flow contemplated by the Agreement: they are "cash receipts realized by" NSJ "in connection with the ownership and operation of the Project." (LLC Agreement Ex. B at 5.) Moreover, the Agreement's definition of Major Capital Event shows that a lease is not such an event. TH/North and Tishman contend that a lease is a "disposition" of a "part of the property" or an "interest" in the property, and thus constitutes a Major Capital Event. (LLC Agreement Ex. B at 4.) This reading of the definition of Major Capital Event is not reasonable. The Agreement is clear that a Major Capital Event is a final event, such as the sale or condemnation of the property, not the relatively short-term lease at issue here. Perhaps if the property were subject to a 99-year lease or the like, an argument could be made that a final event akin to a sale had occurred. A ten-year lease is not akin to the sale

of the property, however, and the lease is simply not a Major Capital Event. Because the lease is not a Major Capital Event, the proceeds cannot constitute Net Capital Proceeds. Thus, the lease proceeds are Net Cash Flow and must be distributed accordingly.

**CONCLUSION**

For the foregoing reasons, and upon all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Judgment on the Pleadings (Clerk Doc. No. 55) is **GRANTED**;

2. Plaintiff NSJ Investors, Inc. is **ORDERED** to distribute the interpleaded funds and all future rents received from the lease at issue pursuant to section 4.2(a) of the LLC Agreement;

2. Defendants' Motion to Dismiss Cross-claims (Clerk Doc. No. 63) is **GRANTED**; and

3. Defendants' Motion to Compel Distribution (Clerk Doc. No. 63) is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 9, 2002

Paul A. Magnuson
United States District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*